IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARNOLD HAMOVITZ,                    )
                                   )
           Plaintiff               )
                                   )
     v.                            )    Civil Action No. 07-454
                                   )    Judge Terrence F. McVerry
SANTA BARBARA APPLIED              )    Magistrate Judge Lisa Pupo Lenihan
RESEARCH, INC. and MAYTAG          )    Doc. Nos. 53, 56 and 60
AIRCRAFT CORP.,                    )
                                   )
           Defendants              )

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that each Defendant's Motion for Summary Judgment be denied, with the exception that summary judgment be granted on Plaintiff's claims that he (a) was denied a "benefit of employment" in the Defendants' "hiring/application process" and (b) is entitled to punitive damages, and that Plaintiff's Motion for Partial Summary Judgment be denied.  Judgment on the remaining claims is precluded by questions of material fact as to the Defendants' liability for (a) failure to reinstate Plaintiff to his former position upon his return from active duty service, as required of a successor-in-interest under the USERRA; and (b) discriminatory refusal to hire Plaintiff upon his return from active duty service.

## II. __REPORT__

### A. __Statement of Facts and Procedural History__

This case involves claims related to Plaintiff's loss of employment upon his return from active duty service in Pakistan.

More particularly, from 2001 to 2006, Plaintiff was employed by V.T. Griffin ("Griffin"), a military support contractor, as the Chief of Airfield Management ("CAM") at the Pittsburgh International Airport Air Reserve Station ("PARS") under its base operations service contract with the United States Air Force Reserve Command.  In addition to his employment at PARS, Plaintiff was a Senior Master Sergeant with the U.S. Air Force Reserve (which he joined in 1989, following six years as a U.S. Marine).  Plaintiff was deployed on several occasions between 2001 and 2004.  In September, 2005, Hamovitz was again deployed - to Pakistan, with an expected return date of December 30th - and properly notified his Griffin Project Manager, Phillip Fratangeli ("Fratangeli").  While Plaintiff was on active duty, Griffin delegated his duties to Douglas May ("May"), who had held the position of Deputy CAM under Hamovitz.

The Griffin PARS contract was expiring by its terms in February, 2006 and, during Plaintiff's active duty service, Defendant Santa Barbara Applied Research, Inc. ("SBAR") competed against Griffin for, and was awarded, an assertedly revised/reformulated PARS service contract.  SBAR, which received preferential treatment as a "small business", subcontracted the maximum forty-nine (49%) of its contractual service obligations to Maytag Aircraft Corporation ("Maytag") through a "Teaming Agreement".[1]

---

[1]  Both Griffin and SBAR "were awarded the PARS contract under a federal program designed to encourage and help small businesses obtain federal contracts."  Maytag's Brief in Opposition to Plaintiff's Motion at 21.  __See also__ Plaintiff's Concise Statement of Material Facts ("Plaintiff's CSMF") at ¶ 33

The agreed-upon phase-in period for the service contract was December 1, 2005 through February 1, 2006. As is apparently not unusual in such circumstances, Defendants made known to the on-site employees that SBAR had been awarded the contract and that employment opportunities would be available. See Maytag's Answer to Plaintiff's Concise Statement of Material Facts at ¶ 40 (citing Frantangeli's testimony that he sent a roster of employees to the SBAR manager).[2] Maytag sent its job application forms to Fratangeli, who accepted an offer from SBAR to become the SBAR/Maytag Project Manager in early December, 2005.[3]

Fratangeli notified the department heads to pick up the employment applications, and they were distributed (unsolicited) to Griffin employees. See Plaintiff's CSMF at ¶ 64. In early December, 2005, a meeting was also held for the Griffin employees, at which they were instructed on the Maytag application process, and informed of the specific application requirements and deadlines.[4] In accordance with this information, the Maytag applications were returned by December 16th.

_____

(noting that the PARS contract was "under a small business set aside" from which Maytag was precluded).

[2] Cf. Murphree v. Communications Technologies, Inc., 460 F.Supp.2d 702, 704 (E.D. La. 2006) (noting that military contractor which was awarded contract on re-bid notified prior contractor's employees that it had won contract and they would likely be contacted for employment).

[3] See Maytag's Answer to Plaintiff's Concise Statement at ¶ 46; Plaintiff's CSMF at ¶ 46. As Project Manager, Fratangeli had authority over all "functional areas" of the PARS contract, and their supervisors/managers, including the CAM, and Fratangeli represented both SBAR and Maytag. See Plaintiff's CSMF at ¶¶ 50-54.

[4] Cf. Maytag's Brief in Reply to Plaintiff's Brief in Opposition at 6 (noting Fratangeli's testimony that he also "held weekly managers' meetings and, through these meetings, he kept his managers informed of what needed to be done concerning the applications").

Douglas Harris ("Harris"), Maytag's Director of Business Operations, testified that "it was the first practice of Maytag to offer positions to incumbents as much as possible" before attempting to locate other candidates, that "Maytag gave its application to SBAR to distribute", and that his "expectation was that SBAR would forward any Maytag employment applications to Maytag." Maytag's Answer to Plaintiff's Concise Statement at ¶¶ 37, 66-68. Similarly, Gary Beistel ("Beistel"), the Deputy Project Manager, who "described his duties for SBAR as very similar to his duties for VT Griffin",[5] testified that he believed "that VT Griffin employees were going to be retained by either SBAR or Maytag." Id at ¶ 39.[6] Defendants were aware in December, 2005 that Hamovitz was Griffin's PARS CAM and that he was on active deployment in Pakistan.

In contrast to the informational meeting and distribution of applications to state-side employees, Fratangeli asked the "acting CAM, Doug May" - *i.e.*, the individual to whom Plaintiff's job was delegated during his deployment, and the individual who would later be awarded that position by Defendants - to contact Plaintiff to inform him that he needed to submit paperwork to apply for a job with the new contractors. Defendants acknowledge that "no specific date was communicated to Mr. Hamovitz as to when he needed to submit his

---

[5] See Maytag's Answer to Plaintiff's Concise Statement at ¶ 56.

[6] There are factual disputes in the record regarding the division of "responsibilities" between SBAR and Maytag. Compare, *e.g.*, SBAR's Reply Brief Supporting Motion for Summary Judgment at 3-4 (asserting that effective February 1, 2006, the [CAM] position at the Pittsburgh International Air Reserve Base "fell under Maytag's area of responsibility.") with Plaintiff's Response to SBAR's CSMF at ¶ 12 (asserting that the CAM reported directly to the SBAR Project Manager and represented both Teaming Agreement contractors).

application", but May was instructed to tell Plaintiff (who was on active duty in Pakistan, which sustained a 7.6 earthquake that November) "to get his resume in 'as soon as possible.'"[7]

May sent Plaintiff an e-mail in early December, 2005, advising him that "the new contractor was going to be Maytag and that he might want to get his paperwork in", and sent a second e-mail on January 3, 2006, advising him only to "get his resume in to Mr. Fratangeli 'as soon as possible.'"  Maytag's Brief in Reply to Plaintiff's Brief in Opposition at 8; Maytag's Answer to Plaintiff's Concise Statement at ¶ 82.   No Maytag or other employment application was e-mailed to Plaintiff, although nothing prevented it.  See Plaintiff's CSMF at ¶ 78-79; Plaintiff's Sur-Reply at 2 (citing Fratangeli's Deposition Testimony that he was in possession of Hamovtiz's e-mail address).

Harris' testimony is that a verbal offer for the PARS CAM position was made to May on or about January 3, 2006;[8] May's testimony, however, is that he does not believe he was already in possession of a verbal offer for the PARS CAM position when he notified Plaintiff by e-mail (on January 3, 2006) that he needed to submit his resume for that position.  See Maytag's Answer to Plaintiff's Concise Statement at ¶ 83.[9]

On receipt of May's January 3rd e-mail, Plaintiff requested that his now-spouse, Christine Hamovitz (a U.S. Air Force employee), ascertain what he needed to do.  Plaintiff also notified

---

[7]   Maytag's Answer to Plaintiff's Concise Statement at ¶ 81.

[8]  Cf. Maytag's Answer to Plaintiff's Concise Statement at ¶ 27 (noting Beistel's testimony that prior to Hamovitz's deployment, and when May was serving as Deputy CAM, Beistel believed the former was both more experienced and more knowledgeable).

[9]  Execution of written letter offers, and their written acceptance by employee supervisors, did not occur until late January 2010.  Id. at ¶101.

Lowry Bailey that his deployment had been extended through the end of January, 2006, and that he intended to return to work on February 13th.  <u>See</u> Maytag's Answer to Plaintiff's Concise Statement at ¶¶ 28-29; Plaintiff's Sur-Reply at 4 (noting Bailey's testimony that he reported this communication up "the supervisory chain").  Mrs. Hamovitz was provided an SBAR application form, which she transmitted to Plaintiff by facsimile, which he completed and e-mailed to her from Pakistan, and which she received in the early morning of January10th.  The documentation which Plaintiff completed expressly indicated that he was applying for the PARS CAM position.  Mrs. Hamovitz hand-delivered it to Beistel at PARS, and he delivered it to Fratangeli, who indicated he would give it to George Kelly ("Kelly"), Maytag's Government-On-Site Representative. Fratangeli does not recall whom he informed or on what date, between approximately January 11th and 13th, he forwarded the application.

Manager's resumes for the Maytag functional areas had not been submitted to the Air Force as of January 10, 2006; no commitment for management personnel employment could be made prior to sending the "official resumes" to the Contracting Officer; and May's acceptance of the PARS CAM position was dated January 19, 2006.  <u>See</u> Plaintiff's CSMF at ¶¶ 101-105.  It was necessary to obtain a U.S. Air Force waiver for May's appointment, as he had not completed the in-residence airfield management course.  <u>See</u> Plaintiff's CSMF at ¶ 136.

Ultimately, Hamovitz's application was rejected as untimely.  Defendants now also assert that Plaintiff's application was ineffectual because it was on the SBAR form provided, rather than on a Maytag form, which was not,[10] and because Plaintiff failed to attach a resume.[11]

_____

[10]  <u>Compare</u> Maytag's Answer to Plaintiff's Concise Statement at ¶ 107 (acknowledging Fratangeli's testimony that Hamovitz's completed SBAR application probably contained adequate information to determine his

Virtually every other Griffin supervisory employee was rehired or offered continuing employment at PARS.  See Maytag's Answer to Plaintiff's Concise Statement at ¶ 45 (Nelson "stated he thought that all incumbents on [the PARS] contract were hired by Maytag except for Mr. Hamovitz"); id. (asserting that Wills, a Griffin supervisor, and Schram, another Griffin employee, were also not hired). Cf. Plaintiff's CSMF at ¶ 21, Plaintiff's Brief in Opposition to Maytag's Motion for Summary Judgment at 21 (noting that Wills declined the offer of a position which had been downgraded); Maytag's Brief in Reply to Plaintiff's Brief in Opposition at 7 (noting that Thomas Schram was a "problem" employee); Plaintiff's Sur-Reply at 4 (citing testimony that Schram's position was eliminated).  Maytag was considered a "successor" contractor to Griffin under the collective bargaining agreement between Griffin and Local 95, AFL-CLO, covering all of the Maytag PARS positions.

Plaintiff's deployment was completed on January 25, 2006.  On January 27th he was informed that his employment with Griffin would end as of January 31st.  On February 14, 2006, Plaintiff sent a timely USERRA Request for Reemployment Letter to both Maytag and SBAR.

Plaintiff was denied reinstatement.  Compare Maytag's Answer to Plaintiff's Concise Statement at ¶ 73 (acknowledging that Fratangeli "stated that there was no question that Mr. Hamovitz would have been hired for the CAM position had he not been on military duty but had instead been present onsite and submitted his application [timely]" and that Beistel "stated that

_____

qualifications for the CAM, and that he was undoubtedly qualified).

[11]   Compare Maytag's Answer to Plaintiff's Concise Statement at ¶ 74 (acknowledging Fratangeli's testimony that he believed the relevant documentation could be found in Plaintiff's personnel file); Plaintiff's CSMF at ¶ 72 (noting that Hamovitz's personnel file contained his qualifications and certifications).

he knew of no reason why Mr. Hamovitz would not have been chosen to be the CAM had he

been [at PARS], told when to submit an application, and did so"); Plaintiff's CSMF at ¶¶ 99,

157-159 (discussing testimony of Maytag's Director of Business Operations, Harris, that

Plaintiff's application could have been considered were it received on January 10th, and that he

had received information that Hamovitz's repeated absences - owing to military deployments -

were regarded negatively).  Plaintiff did not contact Griffin regarding another employment

opportunity, as he desired reinstatement to his pre-active duty postion at PARS; moreover, there

is nothing in the record suggesting that Griffin had a comparable position to offer Hamovitz.[12]

Plaintiff initiated this action in April, 2007, asserting that the Defendants' refusal to

rehire him into his original (or a like) position constituted a violation of the USERRA and of the

Pennsylvania Military Affairs Act ("PMAA"), 51 Pa. C.S.A. §§ 7301 *et seq.*;[13] that Defendants

denied him a "benefit of employment . . . related to the hiring/application process";[14] and that

---

[12]  Compare Carr v. RCA Rubber Co., 609 F.Supp. 526, 530 (N.D. Ohio 1985)
(holding that plaintiff could not invoke reemployment rights with RCA when he
had elected to invoke them against his pre-active duty employer, American
Standard).  Cf. Plaintiff's Brief in Opposition to Maytag's Motion for Summary
Judgment (noting that an offer of relocation would not meet the "like status"
requirements of the Act).

[13]  The USERRA effectively establishes a floor for the protection of
servicemembers' rights; many states impose similar and additional obligations on
employers with respect to military leaves.  With respect to the PMAA, the
Pennsylvania legislature indicated its intent that its provisions be construed "in
conformity with all acts and regulations of the United States affecting the same
subjects . . . ."  51 Pa.Cons.Stat.Ann. § 103.  See Tukesbrey v. Midwest Transit,
Inc., 822 F.Supp. 1192, 1200 n. 9 (W.D. Pa. 1993).

[14]  The Report is in agreement with Defendants' analysis of any claim that
Plaintiff, who was not employed by Defendants, could be understood to have
been denied retention, promotion, or a "benefit of employment" by them.  See,
*e.g.*,  Maytag's Brief in Opposition to Plaintiff's Motion at 26-29.  The statutory
provisions and law related to this assertion are quite unambiguous.  See, *e.g.*, 20

Defendants also violated statutory protections when they denied him employment owing to his military service.  Although SBAR was voluntarily dismissed from the case in October, 2007, subsequent to discovery, it was rejoined and those claims reasserted in Plaintiff's December, 2008 Second Amended Complaint.


## B.  Standards on Motion for Summary Judgment

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c).  Summary judgment may be entered against a party who, after adequate time for discovery, has failed to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In considering a motion for summary judgment, the Court examines the facts in the light most favorable to the non-movant, and the party moving for summary judgment must show that the evidence of record is insufficient to carry the non-movant's burden of proof, *i.e.*, that there are no genuine issues of fact to be tried.  Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257-49 (1986).  On a motion for summary judgment, however, the non-movant cannot rely solely on unsupported assertions or conclusory allegations.  Id. at 249.

---

C.F.R. § 1002.5(b) (defining benefits that accrue "to the employee").

C.  **Relevant Statutory Provisions**

The Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301 *et seq.* ("USERRA"), generally (a) prohibits employment discrimination on the basis of military service and (b) requires employers, or their successors-in-interest, to restore qualified former employees, who have served in our country's armed forces and apply for re-employment within the statutorily-prescribed period, to their former (or like) positions.[15]

**1.  Discrimination in Hiring**

Under Section 4311 of the USERRA, a service member may not be denied initial employment on the basis of his military service.  The claimant bears an initial burden of showing by a preponderance of the evidence that his military service was a substantial or motivating factor in the adverse employment action.  Thereafter, the employer must come forward with a preponderance of evidence showing that it would have taken the adverse action for a valid reason nonetheless.  See Tranter v. Crescent Township, 625 F.Supp.2d 298 (W.D. Pa. 2007).

**2.  Rights of Re-Employment**

Section 4312, in turn, addresses rights of re-employment and provides, in pertinent part, that "any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter" if advance notice of such service is provided to the employer, cumulative length of the absence with that employer by reason of service in the

---

[15]  Cf. Murphree v. Communications Technologies, Inc., 460 F.Supp.2d 702, 709 (E.D. La. 2006) ("The statute was designed to protect servicemembers from employment discrimination, and to minimize disadvantages to their civilian careers and disruptions to their lives because of military service.").

uniformed services does not exceed five years; and the person reports to, or submits an

application for re-employment to, such employer in accordance with the statutory requirements.

An employee whose active military duty lasted more than 180 days must submit an application

for reemployment with his employer no later than 90 days after his completion of active duty. 38

U.S.C. § 4312(e)(1)(D).

Under the USERRA, "employer" is now defined to include a "successor in interest" to a

plaintiff's previous employer. 38 U.S.C. § 4303(4)(A)(iv).  Although the USERRA does not

itself define "successor in interest", its legislative history indicates that "[t]he Committee

intend[ed] that the multi-factor analysis utilized by the Court in <u>Leib v. Georgia-Pacific Corp.</u>,

925 F.2d 240 (8th Cir.1991), [wa]s to be the model for successor in interest issues".  H.R.Rep.

No. 103-65, *reprinted in* 1994 U.S.C.C.A.N. 2449 at 2454.  <u>See</u> discussion of <u>Leib</u>, *infra*.

Importantly for purposes of this Report's analysis, the Department of Labor, Office of the

Assistant Secretary for Veterans' Employment and Training, promulgated regulations in late

2005, directing that:

> In general, an employer is a successor in interest where there is a substantial
> continuity in operations, facilities, and workforce from the former employer. The
> determination whether an employer is a successor in interest must be made on a
> case-by-case basis using a multi-factor test that considers the following:
>
> (a) Whether there has been a substantial continuity of business operations from
> the former to the current employer;
>
> (b) Whether the current employer uses the same or similar facilities, machinery,
> equipment, and methods of production;
>
> (c) Whether there has been a substantial continuity of employees;
>
> (d) Whether there is a similarity of jobs and working conditions;
>
> (e) Whether there is a similarity of supervisors or managers; and,

(f) Whether there is a similarity of products or services.

70 FR 75292, Dec. 19, 2005; 71 FR 15338, March 28, 2006; 20 C.F.R. § 1002.35 .

A companion regulation provides that "it is not necessary for an employer to have notice of a potential reemployment claim at the time of merger, acquisition, or other form of succession." Id. at § 1002.36.  See also Senate Report No. 103-158 (1993) (same).

### 3. Liquidated Damages; Fees and Costs

Under the USERRA, the District Court may use its full equity powers and award compensatory damages for lost wages or benefits.  If the Court determines that an employer's violation was willful, it may award liquidated damages in an amount equal to the compensatory damages.[16]  And it may award attorney fees, expert witness fees, and other litigation costs to the prevailing party. See 38 U.S.C. Section 4323(d)-(h); 20 C.F.R. Sections 1002.312-314.


### D.  Purpose and Standards on Application of the USERRA

When Congress passed the USERRA, it declared in the opening section the Act's purpose:

> (a) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;

> (b) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and

---

[16]  As Maytag correctly observes, neither the USERRA nor the PMAA, which mirrors it, contain any provision for punitive damages.

(c) to prohibit discrimination against persons because of their service in the uniformed services.

38 U.S.C. § 4301.

And the Courts of Appeals have universally directed that the provisions of USERRA are to be liberally construed in favor of the uniformed service member. See, *e.g.*, Gordon v. Wawa, Inc., 388 F.3d 78, 81 (3d Cir.2004).  Cf. Kay v. General Cable Corporation, 144 F.2d 653, 654 (3d Cir. 1944) ("Every consideration of fairness and justice makes it imperative that the [precursor] Statute should be construed as liberally as possible so that military service should entail no greater setback in the private pursuit or career of the returning soldier than is unavoidable. The question here presented, therefore, is not to be solved by the application of abstract tests or formulae; but the factors which usually determine the nature of a disputed relationship must be considered in the light of the purpose which Congress intended to accomplish.").[17]

---

[17]   See also Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312-13 (4th Cir.2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries"); McGuire v. United Parcel Serv., 152 F .3d 673, 676 (7th Cir.1998) ("USERRA is to be liberally construed in favor of those who served their country"); Coffy v. Republic Steel Corp., 447 U.S. 191, 196 (1980) (noting that predecessor statute to USERRA "is to be liberally construed for the benefit of the returning veteran"); Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 284 (1946) (explaining that policy behind veteran's law is to ensure that veterans returning to civilian employment are not penalized by their service, but rather, gain by their service "an advantage which the law withheld from those who stayed behind" and it is to be liberally construed); Chaltry v. Ollie's Idea, Inc., 546 F.Supp. 44, 50-51 (W.D. Mich. 1982) (noting "crucial" nature of veteran's rights; that "[a]mong the national government's most essential functions is the preservation of our democracy through the maintenance of a strong armed forces"; and that veteran's legislation "attempts to compensate those who gave critical years to their country" with a "focus . . . on the plaintiff veteran's need for reemployment").

**E.  Analysis**

**1.  Successor in Interest's Reinstatement Obligations Under USERRA**

Defendants assert that they had no obligation to reinstate Plaintiff upon his return to service, as a successor-in-interest under the USERRA, because they were without privity to Griffin. See, *e.g.*, Maytag's Brief in Opposition to Plaintiff's Motion for Summary Judgment ("Maytag's Brief in Opposition") at 3-4.

**a.  Successorship Absent Privity; Contextual Nature of Determination**

The Supreme Court has applied successorship obligations to an entity that has no direct connection or link to the original employer, i.e., no privity, in labor case law.  See NLRB v. Burns Internat'l Sec. Servs., Inc., 406 U.S. 272, 277-81 (1972) (holding that a prevailing competitive bidder which hired a substantial complement of the prior employer's workers was a "successor employer" for purposes of duty to bargain with employees' union, but was not bound to terms of prior collective bargaining agreement).[18]  See also Systems Management, Inc. v. NLRB, 901 F.2d 297 (3d Cir. 1990) (holding that definition of "successor employer" depended on a finding that the "majority of the employees of the former enterprise were hired by the new employer") (citing Howard Johnson, *infra*).[19]

---

[18]  In Burns, the Supreme Court noted the continuation of the same security services at the same plant/facility, similar supervisory functions/responsibilities, and continuation in employee identity and job functions (of Burns' 42 plant employees, 27 were hired from its contractual predecessor). 406 U.S. at 281 & n. 4.

[19]  See also NLRB v. Houston Bldg. Serv., Inc., 936 F.2d 178, 180-81 (5th Cir.1991) (subsequent employer who successfully bids for a contract is a "successor employer" with a duty to bargain with union), *cert. denied*, 502 U.S. 1090 (1992).

It has also expressly directed that "[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context.  A new employer, in other words, may be a successor for some purposes and not for others."  Howard Johnson Co. v. Detroit Local Joint executive Bd, hotel & Restaurant Employees, 417 U.S. 249, 263 n. 8 (1974).  Accordingly, it has admonished the lower Courts that, "[p]articularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."  Id. at 256.  And it has indicated that an assessment of successor liability should be informed by an analysis of each party's interests and the policies of the particular law sought to be enforced.  Id. at 262-63, n. 8.

### b.  Case Law Regarding Reinstatement Obligations to Service Members

In April, 1948 the Third Circuit concluded that a Navy shipyard tenant, which had succeeded the plaintiff's bankrupt employer under a lease from the bankruptcy trustee, was not obligated to reinstate the plaintiff nurse to her prior shipyard position after her discharge from active-duty service.  See Kicinski v. Constable Hook Shipyard, Inc., 168 F.2d 404 (3d Cir. 1948).  In considering the defendant's obligations under the Selective Training and Service Act of 1940 §8, 54 Stat. 890 (the "STSA"),[20] the Third Circuit observed that the question was "beclouded by the fact that the tenancy of the situs of the petitioner's pre-induction activities changed hands" and that the question, "then, [was] whether the circumstances surrounding the succession of tenants was such that [there] existed an obligation on the part of the respondent

---

[20]  As the nations' first peacetime draft law, the STSA of 1940 included statutory re-employment rights for veterans. It was enacted pursuant to the Congressional war power of Article I, Section 8 of the Constitution.

toward the petitioner by reason of the Act." Id. at 405.  The Court went on to discuss the
"materially different" contract terms for the construction of navy vessels; the replacement of all
corporate officials and "practically all of [the former employer's] departmental heads"; the
retention of most "production employees"; defendant's month-to-month rental of the shipyard
from the bankruptcy trustee and take-over of the "bare yard" (at which production had previously
entirely ceased); and the absence of any common stockholders, assumption of obligations, or
other arrangements between the former employer and defendant. Id. at 407.  Ultimately, it
concluded that the evidence failed "to support the finding of that continuity or privity . . . which
would project" a re-employment duty onto the defendant, and that the lease was not "decisive"
where there was no assumption of the  employer's business.  Id. at 408.[21]

Finally, and perhaps most importantly, the Circuit noted that "[t]he duty created by the
controlling statute [*i.e.*, the STSA of 1940] expressly falls solely upon the employer in whose
employ the veteran was at the time he entered the service." Id. at 409.  Compare Selective
Service Act of 1948, 62 Stat. 604 (June 24, 1948) (expanding the re-employment portion of the
law to include not only the returning veteran's former employer, but also any "successor in
interest").  See also Rix v. Turnbull-Novak, Inc., 260 F.2d 785, 788 (8th Cir. 1958) (explaining
that under prior Acts the veteran had reemployment rights only against his employer, and that
1948 Act expanded obligations to veterans, but did not define a "successor in interest").[22]  This

---

[21] See also id. (holding "that the nature of the business . . . was the same, and that
they occupied the same premises successively do not, without more, operate to
alter their independent character, nor impose" liability under the Act); id. (noting
absence of "such reorganization, absorption, merger, consolidation, or other
manifestation of corporate or business continuity as should impose" that liability).

[22] Subsequent legislation further expanded the statute's application to state and
local government employers and to reservists, employees returning from training,

Circuit has not addressed the re-employment obligations of a "successor in interest" under subsequent legislation.

In the intervening decades, the United States Supreme Court has, as discussed above, addressed some general aspects of successor liability relevant to this analysis, and several of our sister Courts have since considered the parameters of "successor in interest" in the context of re-employment obligations to service men and women.

In 1991, the Eighth Circuit, "mindful" of  the Supreme Court's "admonition" in Howard Johnson, considered the scope of re-employment obligations under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021 *et seq.* ("VEVRAA"), in a case brought on behalf of a returning Air Force veteran by the United States government.  See Leib v. Georgia-Pacific Corp., 925 F.2d 240, 242, 244 (8th Cir. 1991).  In reversing a grant of summary judgment for the defendant, the purchaser of a manufacturing plant, the Leib Court concluded that "substantial continuity of the same business operations" was only one of "a variety of factors" in assessing successor obligations under the VEVRAA, and that other factors in a test for successor liability which looked "to the practical realities of business continuity" and "the totality of the circumstances" included: use of the same plant; continuity of work force;[23] similarity of jobs and working conditions; similarity of supervisory personnel; similarity in

---

and those in the National Guard.  See Monroe v. Standard Oil Co., 452 U.S. 549, 555 (1981); Peel v. Florida Dept. of Transportation, 600 F.2d 1070, 1084 (5th Cir. 1979).

[23].  The defendant hired a majority of the employees, recognized their labor union, and credited their seniority for vacation and pension vesting purposes.  Leib, 925 F.2d at 241.

machinery, equipment and production methods; similarity of products or services;[24] notice of claim; and change of circumstances making it impossible or unreasonable for defendant to re-employ the veteran.  Id. at 245-247.[25]   The Court observed, in accordance with Howard Johnson, that consideration of circumstances such as these "properly balances the rights of employers and returning veterans, and best effectuates Congress' intent under the veterans' reemployment statute."  Id. at 247.

---

[24]   The defendant operated the same facility making the same product under the same conditions using the same equipment.  Id.

[25]   The Eighth Circuit referred to an earlier VEVRAA decision which looked to the nine factors utilized to assessor successor liability in a Title VII case, finding analogy to civil rights and labor cases persuasive.  See Chaltry v. Ollie's Idea, Inc., 546 F.Supp. 44, 51 (W.D. Mich. 1982).  The Chaltry Court had applied the following nine factors:

> (1) whether the successor company had notice of a claim; (2) the ability of the predecessor to provide relief; whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same facilities; (5) whether he uses the same or substantially the same work force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; and (8) whether he uses the same machinery, equipment, and methods of production; and (9) whether he produces the same product.

Id.

And the Leib Court looked to the nine-factor business continuity test for a successor's re-employment obligation which was set forth in the Department of Labor's Reemployment Rights Handbook, at 9-2 to 9-3 (1986), and observed that in light of the legislative history, "analogy to successor liability" under the labor law was appropriate.  Id. at 246 (noting that the defendant had conceded that it was "recognized as a successor employer under the labor laws and ha[d] bargained with the union").  Cf. id. at 247 (also noting that same factors were applied in claims of Title VII discrimination).

In 2005, the Eleventh Circuit considered a veteran's claim, under the USERRA, against a corporation that had replaced his active-duty employer as the primary contractor for support services at an Air Force base.  See Coffman v. Chugach Support Services, Inc., 411 F.3d 1231 (11th Cir. 2005).  The Coffman Court concluded, as a matter of first impression, that the subsequent contractor was not a successor-in-interest under the USERRA, because a re-employment obligation under the Act required a threshold showing of  privity in the form of a merger or transfer of assets.  Id. at 1237 (concluding that a Leib factor analysis is "unnecessary and improper when no merger or transfer of assets even transpired between the two subject companies", as "generally" required for "the imposition of successor liability") (citing Kicinski).

As discussed, supra, however, shortly after the Eleventh Circuit's June, 2005 decision in Coffman, the Department of Labor's interpretive regulations on successor liability, including a codification of the Leib factors, went into effect.  See 20 C.F.R. § 1002.35.[26]  Under the regulations, which are entitled to deference, the determination of whether an employer is a successor-in-interest must be made on a case-by-case basis using a multi-factor test that considers (1) substantial continuity of business operations; (b) use of same/similar facilities, machinery, equipment, and methods; (c) substantial continuity of employees; (d) similarity of jobs and working conditions; (e) similarity of supervisors/managers; and (f) similarity of products or services.  Id.  As noted supra, a companion regulation provides that "it is not necessary for an employer to have notice of a potential reemployment claim at the time of merger, acquisition, or other form of succession."  Id. at § 1002.36.

---

[26]  The regulation became effective January 18, 2006, approximately six months after the Coffman decision was rendered.  See Reynolds v. Rehabcare Group East, Inc., 531 F.Supp.2d 1050, 1060 (S.D. Iowa 2008).

There have been two further decisions on successor-in-interest re-employment obligations under the USERRA, based expressly on the regulations:

In November, 2006, the District Court for the Eastern District of Louisiana concluded, as a question of first impression within the Fifth Circuit, that issues of material fact precluded summary judgment on the liability of a military support contractor, as the successor-in-interest of a prior contractor within the meaning of the USERRA.  Murphree v. Communications Technologies, Inc., 460 F.Supp.2d 702 (E.D. La. 2006).  In applying the Leib "business continuity" test, "emphasizing the actual undertakings of the alleged predecessor and successor companies", the Murphree Court expressly noted that the defendant indicated its intention to provide substantial continuity of employees following its successful bid, there was substantial similarity of jobs and working conditions, and the contract services provided by the employees were essentially the same. The Murphree Court duly noted that the recent regulations were entitled to deference and that they recognized a "residual category" of successorship for purposes of the Act.[27]  The Court also observed that when Murphree sought the assistance of the U.S. Department of Labor's Veterans Employment and Training Service,[28] it "completed an investigation and determined that [defendant] was a successor-in-interest to [the prior contractor and] owed Major Murphree re-employment rights".  Id. at 705.  Finally, the Court - in language reflecting the guidance of Howard Johnson, *supra* - noted the important distinctions between,

---

[27]  Id. at 708 (concluding that the "disjunctive language of the regulation establishes that a merger or acquisition is *not* required [and that t]he language 'other form of succession' recognizes a residual category").

[28]  See *supra* at 11-12 (discussing the agency's promulgation of the regulations on successorship under the USERRA).

*e.g.*, a "corporate law concept" of successor liability and "'the labor law concept of successor liaiblity [which] requires courts to balance the equities of imposing a particular legal obligation in a particular situation, considering (1) the interests of the defendant-employer, (2) the interests of the plaintiff-employee, and (3) the federal policy embodied in the relevant statutes.'" Id. at 708 (quoting Cobb v. Contract Transport, Inc., 452 F.3d 543, 550-51 (6th Cir. 2006) (addressing successor liability under the FMLA)).[29]

More recently, the District Court for the Southern District of Iowa also applied the Leib test in considering the USERRA reemployment obligations of a replacement service contractor. See Reynolds v. Rehabcare Group East, Inc., 590 F.Supp.2d 1102 (S.D. Iowa 2008) (concluding, where retirement community with contract for rehabilitative therapy services became a "skilled nursing facility" and contract was terminated, that subsequent service contractor was not successor-in-interest under USERRA statute and regulations as there was (a) no substantial continuity of business operations, (b) no substantial continuation of equipment or supplies, (c) no substantial continuation of employees (*i.e.*, *no* employees of the prior contractor were employed by the subsequent contractor), (d) no similarity between the supervisors and managers (*i.e.*, *no* prior manager or supervisor assumed that position with the subsequent contractor), and (e) different working conditions); id. at 1121 ("Having considered all of the Department of Labor/Leib factors, the Court finds, . . . Plaintiff cannot demonstrate a continuity of business

---

[29]   Cf. Plaintiff's Brief in Opposition to Maytag's Motion for Summary Judgment at 11, n. 9 (observing that "the considerations set forth in Cobb are even more persuasive [where] . . . the leave is not for the employee's benefit but for the benefit of the country in the form of military service").

operations, a continuity of employees, or a similarity in supervisor and managers.  See 20 C.F.R.

§ 1002.35.").[30]

###   c.  Case Law in the Third Circuit Regarding the Scope and Obligations of Successorship in Other Doctrinal Areas

Defendants rely heavily upon analogy to, and language excerpted from, Third Circuit

cases in other doctrinal areas.  For the reasons discussed below, these decisions are

distinguishable and do not indicate that this Circuit would apply a USERRA analysis, or an

interpretation of the Department of Labor's regulations, different from those Courts to have

considered the issue in light of those regulations.

Maytag is correct in its labor-law observation that the Third Circuit has not imposed an

"obligation to be bound by the terms of the [collective bargaining agreement] or to negotiate

grievances" thereunder.  Maytag's Brief in Opposition at 4; 10-12.  See Ameristeel Corp. v.

Internat'l Brotherhood of Teamsters, AFL-CIO Local 430, 267 F.3d 264, 273 (3d Cir. 2001)

(holding that manufacturer which retained majority of local union's members employed at plant,

and expressly refused in purchase agreement to be bound by predecessor's collective bargaining

agreement, was not bound to arbitration under substantive provisions of that agreement);[31]

---

[30]  See also id. at 1113 (noting that Court specifically rejected Coffman in favor of Leib and Murphree test, with citations to statute and regulations adopting Leib); id. at 1120 (rejecting plaintiff's assertions that successor liability could derive from continuation of same supervisors and employees - during tenure of both service contracts - by *facility operator* itself, rather than continuation of employees as between service contractors).

[31]  The Circuit distinguished the Supreme Court's decision in John Wiley & Sons v. Livingston, 376 U.S. 543 (1964), which held that a successor employer could, in some circumstances (such as merging, and hiring all of the predecessor's employees), be bound by an arbitration clause in a predecessor's collective bargaining agreement.  See 267 F.3d at 269-271.  Cf. 267 F.3d at 285 (Becker, C.J.) (dissenting) (understanding Wiley, Burns, and Howard Johnson trilogy to

United Government Sec. Officers of Amer. v. Exelon Generation Co., 2009 WL 3182859 (M.D. Pa.  Sept. 30, 2009).  A successor-in-interest under the USERRA is held, however, not to the terms of a privately negotiated contract, but to a federal statute establishing protected job status for service men and women (*i.e.*, to the recognition of federal statutory rights which arise from the employee's status).  Cf. Leib, 925 F.2d at 246 (noting that "the [veterans' reemployment law] requires successor employers to rehire returning veterans to facilitate Congress' provision for this country's defense, not to address wrongdoing on the part of the predecessor employer");[32] id. at 246, n. 7 (further explaining that "[i]n this respect, a successor employer's obligation to rehire qualified returning veterans may be more akin to a successor's obligation [under Burns] to

_____

articulate a "sliding scale" for successorship burdens).

[32]  Cf. Horton v. Georgia-Pacific Corp., 1990 WL 68552 (E.D. Mich. Feb. 1, 1990) (noting that "the 'wrong' complained of was not that of the predecessor . . . but resulted from [subsequent plant operator]'s own refusal to rehire [plaintiff] upon his return" from service).  Compare Maytag's Brief in Opposition to Plaintiff's Motion at 23 (asserting that "it would be inequitable as a matter of law to compel Maytag to hire" an employee from a company "with whom Maytag had no opportunity to conduct due diligence and assess what potential exposure it could be incurring"); SBARS Reply Brief Supporting Motion for Summary Judgment at 4 (asserting that successor liability is "fair" because the successor "knows, or reasonably should anticipate that its actions may case it to acquire both the benefits and liabilities of the predecessor").

Cf. also Travis R. Hollifield, Successor Liability Issues in Labor and Employment Cases, Fla. Bar Journal, Jan. 2007 at 48 (noting that federal common law successor liability theory differs significantly from state successor liability 'alter ego' or '*de facto*' merger rules applicable to general business debts and other liabilities; that privity is not required as a precondition to the imposition of successor liability in federal labor law; and that while "privity can be a relevant factor to consider when confronting claims" that relate to a predecessor's discrimination or unfair labor practices, there is no reason to consider it "a precondition to the imposition of [an independent] statutory duty upon a successor"); Plaintiff's Brief in Support of Motion at 14-15.

bargain with an existing union than to a successor's obligation to remedy an act of unlawful discrimination previously committed by its predecessor").[33]

The three-pronged analysis of Howard Johnson is meant to encompass consideration of just these differences in interests and policy purposes.[34]  Thus, Defendants' reliance on Polius v. Clark Equip. Co., 802 F.2d 75 (3d Cir. 1986) is at least equally misguided.  See id. (declining to create successor liability for products liability plaintiffs under "products line" or "continuity of enterprise" exceptions); id. at 83 (noting, in following majority doctrine, the importance of business considerations and "[p]redictability . . . in the corporate field" weighing against "unforseen alterations in successor liability principles").

Next, the Circuit Court's holdings, in the Title VII context, that successor liability *should* be imposed in certain circumstances where the assets of the predecessor employer were sold or transferred to the defendant, certainly do *not* circumscribe the other circumstances in which the Circuit might also conclude that a form of successor liability is warranted.  See Maytag's Brief in Opposition to Plaintiff's Motion at 6-7 (citing Rego v. ARC Water Treatment Co. of

---

[33] Cf. Maytag's Brief in Opposition to Plaintiff's Motion at 10 ("Burns makes is [*sic*] clear that the mere fact that an employer is doing the same work in the same place with the same employees *does not impose extra obligations* upon that employer absent some sort of merger, stock acquisition, reorganization or asset purchase.") (emphasis added).  To the contrary, what Burns makes clear is that those factors do not render the successor bound by the terms of the predecessor's agreement, a holding which is not in tension with the USERRA.  See, *e.g.*, Burns, 406 U.S. at 287 (explaining that federal labor policy of preventing industrial strife did not outweigh "the bargaining freedom of employers and unions").

[34]. Compare Maytag's Brief in Opposition to Plaintiff's Motion at 6 n. 1 (asserting that "under the general law of successor liability", [it] cannot be deemed a successor") with Ameristeel, 267 F.3d at 267-68 (explaining that the question whether an entity "is a successor . . . 'is simply not meaningful in the abstract'") (quoting Howard Johnson).

Pennsylvania, 181 F.3d 396 (3d Cir. 1999); Brzozowski v. Correctional Physician Servs., Inc., 360 F.3d 173 (3d Cir. 2004)).  Similarly, the Third Circuit's holding that successor liability may be imposed in that context where there has been a *de facto* merger or "continuation of the enterprise" does not preclude its also concluding, *i.e.*, in light of the USERRA's statutory and regulatory language, that successor-in-interest liability may be imposed under the Leib multi-factor test.  See id. at 7-8 (citing Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455 (3d Cir. 2006)).

### d.  Defendants' Parade of Horribles

In response to the dire predictions raised at various points in Defendants' pleadings, the Report notes simply that obligations under the USERRA's re-employment provisions are limited to employers and their successors-in-interest under criteria well-specified by the Department of Labor's regulations and the Leib opinion, and the Act's protections are afforded only to qualified service men and women.  The Report further notes, in light of the facts of this case, that qualified active-duty servicemembers' existence may be readily identified in the course of a successor's determination to re-employ a predecessor's workforce in its continuance of, *e.g.*, plant or government service operations/contracts.[35]  The Report also notes that available to any successor-in-interest is the hardship defense that the "circumstances have so changed as to make it impossible or unreasonable" to rehire the veteran plaintiff - a defense which has not been raised by the Defendants.

---

[35]  This information would be determinable from, *e.g.*, union lists.  See Horton v. Georgai-Pacific Corp., 1990 WL 68552 (E.D. Mich. Feb. 1, 1990); *supra* at 3 (noting that employee roster was provided by Fratangeli to Defendants).

**e. Conclusion as to Successor-in-Interest Obligations**

In summary, this Report concludes that questions of material fact regarding factors relevant, under the provisions of the statute and the agency's interpretive regulations, to the Defendants' liability as successors-in-interest under the USERRA preclude summary judgment in favor of any party on this claim.  First, although the Third Circuit has not considered this issue subsequent to Congressional legislation expanding re-employment obligations to successors-in-interest, the regulations - which are entitled to deference - are properly understood to have codified a multi-factor, case-by-case test which does not set any one factor as a prerequisite or threshold.  This understanding is supported by the Department of Labor's agency determination, on behalf of Major Murphree, that a military service contractor was a successor-in-interest, for purposes of the Act, in largely factually analogous circumstances.  See discussion *supra* at 20. And it is consistent with the two (2) post-regulation decisions of our sister Courts on this question.  See Murphree and Reynolds, *supra*.  In addition, Defendants' extensive assertions to the contrary notwithstanding, nothing in the law of this Circuit in other doctrinal areas persuades this Court that the Circuit would reach a differing interpretation.  Accordingly, summary judgment should be denied to all parties.[36]

Under this analysis, the evidence before this Court tends to support Plaintiff's position. Defendants appear to have provided substantial continuity in their assumption of responsibility for the service contract at PARS; there appears to have been substantial continuity in the facilities and equipment; there appears to have been substantial similarity of supervisory

---

[36] Compare Maytag's Brief in Opposition to Plaintiff's Motion at 12 ("Maytag has [complied with its "extremely narrow obligation" to recognize and negotiate with the predecessor employees' union] and cannot be compelled to do more.").

personnel, jobs and working conditions - including the title and basic function of Plaintiff's

position as CAM.[37]  There is, therefore, at the least, a genuine issue of material fact as to

Defendants' obligations, by virtue of their own decisions and actions, as successors-in-interest.

### 2.  Protections from Discrimination in Hiring Under § 4311

Plaintiff also alleges that Defendants discriminated against him on the basis of his

military service in violation of 38 U.S.C. § 4311.[38]  Unlike the McDonnell Douglas framework,

the procedural framework and evidentiary burdens of § 4311 shift the burden of persuasion, as

well as production, to the employer.  For under the USERRA, the plaintiff must make an initial

showing that military status was at least a motivating or substantial factor, upon which the

defendant must prove, by a preponderance of the evidence, that the action would have been

taken despite the employee's protected status.  See, e.g., Sheehan v. Dept. of Navy, 240 F.3d

1009, 1014 (Fed. Cir. 2001) (requiring employer to establish that legitimate reasons, standing

alone, would have induced it to take the same action); Tranter v. Crescent Township, 625

F.Supp.2d 298 (W.D. Pa. 2007).

The term "motivating factor", for purposes of the USERRA, means that if the employer

was asked its reasons at the moment of decision, and gave a truthful answer, one of those reasons

would be the employee's military service or related obligations.  39 U.S.C.A. § 4311, Trenter,

625 F.Supp.2d at 302.  The factual question of discriminatory motivation or intent may be

---

[37]  See generally Plaintiff's Brief in Support of Motion at 20-22.

[38]  See § 4311 (c) (prohibiting denial of employment where membership/service in uniformed services is a motivating factor in employer's action, unless employer can prove that adverse action would have been taken absent such membership/service.  See also supra at 8 (noting parallel provisions of the PMAA).

proven by either direct or circumstantial evidence.  Id.  Thus, it may be reasonably inferred from

a variety of circumstantial factors, including (most pertinently to this case): proximity in time

between military activity and the adverse employment action; inconsistencies between the

proffered reason and other actions of the employer; expressions of hostility towards protected

service members; and disparate treatment of certain employees compared to others with, *e.g.*,

similar work records. Id.

　　　　Defendants assert that they did not discriminate against Plaintiff in declining to hire him,

as SBAR had no such position, and Plaintiff never applied for a position with Maytag. See, *e.g.*,

Maytag's Brief in Opposition at 2; id. at 30 ("No case law cited by Plaintiff indicates that a

potential employer has an obligation to hire someone who has never applied to it for a job . . .

."); id. ("An SBAR application is not a Maytag application.").  The Report finds the latter

assertion particularly troubling; indeed, Defendants' positions may reasonably call the credibility

of their testimony on this issue into question.

　　　　The record strongly suggests that Plaintiff was treated differently from other Griffin

supervisors/managers, and that his continuation in employment at PARS was (unlike that of

other Griffin supervisors/managers) not only poorly facilitated but - a reasonable jury could find

- obstructed.  Considering the factual record as a whole, Defendants' assertions could reasonably

be viewed as pretextual and/or post-hoc justifications.  For example, Defendants protest

Hamovitz's untimeliness in completing their requisite application materials, when a reasonable

jury could conclude that Defendants themselves were responsible for an incriminating failure to

communicate timely, sufficient, and/or accurate information.[39]  Similarly, Defendants purport to

have rejected Plaintiff's employment application because it was on the wrong form, when a

reasonable jury could conclude that Defendants themselves provided that form, that Defendants

were (through Plaintiff's application information, his personnel files, the knowledge and

recommendation of Defendants' own Project Manager(s), or otherwise) in possession of

sufficient information to consider Plaintiff's request for employment, and/or that Defendants

made an implicit and/or express representation that the form's completion and return would

constitute/constituted an acceptable application for employment.  A reasonable jury might also

conclude that Defendants were motivated by hostility owing to Hamovitz's repeated calls to

duty.  See discussion supra at 8.

        Defendants were aware in December, 2005 that Plaintiff was the PARS CAM and that he

was on active duty.  A reasonable fact finder could conclude that they were also aware, or

reasonably should have been aware, by January 3, 2006, of Plaintiff's desire to return to that

position with the contractors taking over the PARS services. Despite his post-deployment

availability and qualifications, including his familiarity with and years of satisfactory

performance in the PARS CAM position, Hamovitz received no application when they were

distributed to other, state-side employees, and the application ultimately provided and completed

was rejected.

---

[39]   The Court also notes, in response to Defendant's protestations of Plaintiff's
alleged employment-status delinquencies, that an important purpose of the
USERRA is to alleviate servicemember's employment concerns while they are on
active duty.  Cf. Lieb, 925 F.2d at 243 ("That worry over losing a job might have
a substantial adverse impact on the morale of the armed services is plain.  Indeed,
the morale problem was viewed as the source of Congressional power to enact
reemployment laws . . . .").

Thus, there is clearly a "sufficient evidentiary basis to permit the finders of fact to consider whether the adverse employment action was motivated at least in part by improper discrimination."  625 F.Supp.2d at 303.[40]

### 3.  Material Fact Questions Regarding SBAR and Maytag's Relationship as Employers

As set forth at some length in Section II(A) of this Report, there are numerous areas of fact questions, and conflicting evidence, regarding contractual responsibilities, hiring processes/responsibilities,  personnel supervision, employment positions, and various overlapping or conflation of job duties, reporting and organizational structure, as between Maytag and SBAR with regard to the PARS contract services.  These factual disputes are material to the remaining claims and, accordingly, preclude summary judgment in favor of SBAR.  See generally discussion *supra*; Plaintiff's Brief in Opposition to SBAR's Motion for Summary Judgment. See 38 U.S.C.A. Section 4303 (4) (defining "employer" for purposes of the Act as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities"); Plaintiff's Brief in Support at 29-30 (discussing joint employer analysis).[41]

---

[40] As discussed above, questions of material fact also preclude summary judgment with respect to Plaintiff's claims under the parallel provisions of the Pennsylvania Military Affairs Act. Cf. Murphree, 460 F.Supp.2d at 711 (denying summary judgment on claim under state law adopting the protections of the USERRA, where genuine issues of material fact existed as to defendant's successor-in-interest status under federal law).

[41] Cf. Brandsasse v. City of Sufolk, Va., 72 F.Supp.2d 608 (E.D. Va. 1999) (finding both city, as direct employer, and its director of personnel, who had authority over hiring, were subject to liability as employers); Risner v. Ohio Dept. of Rehabilitation and Correction, 2008 WL 2120542 (N.D. Ohio 2008) (finding liability under the USERRA on basis of ability to effectuate compliance).

### 4.  **Liquidated Damages**

As noted, *supra* at 12, the USERRA provides for liquidated, but not punitive damages, in the case of "willful" violation.  Under the facts *sub judice*, as discussed above, the Report concludes that there are material fact questions relevant to Defendants' liability for liquidated damages, and that summary judgment is therefore precluded.  <u>See</u> Plaintiff's Brief in Opposition to Maytag's Motion for Summary Judgment at 22-23 (discussing, *e.g.*, evidence suggestive of intentional discrimination).

## III.  <u>CONCLUSION</u>

In accordance with the above factual history and legal analysis, it is respectfully recommended that each Defendant's Motion for Summary Judgment be denied, with the exception that summary judgment be granted on Plaintiff's claims that he (a) was denied a "benefit of employment" in the Defendants' "hiring/application process" and (b) is entitled to punitive damages, and that Plaintiff's Motion for Partial Summary Judgment be denied as well.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2  of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: Feb. 26, 2010

_____
Lisa Pupo Lenihan
United States Magistrate Judge

31